DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

SHEILA A.G. ARMBRUST (CABN 265998)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6961
    FAX: (415) 436-7234
    sheila.armbrust@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 18-00251-01 WHO |
|     Plaintiff, | |
|   v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| JESUS GUADALUPE SALAZAR, | |
|     Defendant. | |

## I.    INTRODUCTION

As the multiple federal wiretaps and periods of surveillance make clear:  Defendant is responsible for bringing staggering amounts of methamphetamine and heroin from Mexico into the Northern District of California and beyond.  He brought some of those drugs into the country after he was arrested in this case and released on pretrial supervision.  The government recommends that defendant be sentenced to 240 months in custody, a significant sentence, and one that will protect victims in this district for a significant period of time from someone who peddled the poison that devastates the lives of so many in this District.

## II.    THE DEFENDANT'S OFFENSE CONDUCT

As the Presentence Report explains, defendant was the target of two wiretap periods and extensive investigation that made clear that he was a significant contributor to the methamphetamine and heroin epidemics that plague the West Coast.  Defendant dealt heroin and methamphetamine locally to redistributors, one of whom would meet him at his home and then sell drugs to a Confidential Informant (CI) working with law enforcement.  *See* Presentence Investigation Report ("PSR") at ¶¶ 8-18. Defendant communicated with individuals who lived in Mexico, ordering drugs from senior drug traffickers in Mexico, who would dispatch others across the border to meet Defendant in Southern California.  PSR ¶¶ 16, 17.  In these calls, he talked about kilogram and pound-quantities of cocaine, heroin, and methamphetamine.  PSR ¶¶ 16, 18, 27.  Defendant personally obtained these drugs in Southern and Central California, driving them back into this District, and occasionally directing them to the Seattle, Washington area.  *Id.*  As the PSR makes clear, Defendant is responsible for transporting and distributing a staggering quantity of drugs, many of which were seized during two separate seizures directly from the Defendant.  The first took place on May 29, 2018.  *Id.* at ¶ 21.  On days leading up to this traffic stop, agents had listened to calls and watched defendant go to the Los Angeles area to obtain drugs from multiple individuals.  During this time period, Defendant contacted his brother, co-defendant Eduardo Salazar, to ask him to help Defendant to obtain methamphetamine.  *Id.* at ¶ 20.  As defendant drove back to his home, California Highway Patrol stopped him, finding approximately 9 kilograms of methamphetamine and 2 kilograms of heroin in his car.  *Id.*  That same day, agents executed a search warrant at defendant's home, finding more methamphetamine and heroin, two loaded 9 millimeter firearms, a .22 caliber rifle, extra ammunition and magazines, and a stream light or laser to be placed on a firearm.  *Id.* at ¶ 22-23.

Defendant was released on an unsecured, $100,000 bond.  *Id.* at ¶ 4.  While on release, and unbeknown to law enforcement, defendant obtained a new cellphone (not the one that was being consensually monitored by law enforcement) and began speaking with an individual in the Seattle-area about arranging a large methamphetamine transaction.  *Id.* at ¶ 25.  Unbeknown to Defendant, that individual was another CI acting on behalf of law enforcement in Seattle.  *Id.*  In these calls, Defendant promised to bring 50 pounds of methamphetamine to the CI if their first meeting went well.  *Id.* at ¶ 26.

But, during that meeting on October 10, 2018, Defendant was arrested again with nearly 8 kilograms of methamphetamine. *Id.*  This conduct took place while Defendant was on pretrial release.

## III.     THE COURT SHOULD OVERRULE DEFENDANT'S OBJECTION TO THE FINAL PRESENTENCE INVESTIGATION REPORT

The government concurs with the Probation Officer's assessment that the two-level firearm enhancement under U.S.S.G. § 2D1.1(b)(1) applies to Defendant's conduct. Guidelines subsection 2D1.1(b)(1) states that a two-level enhancement applies "if a dangerous weapon (including a firearm) was possessed."  Application Note 11(A) to U.S.S.G. § 2D1.1 states that the "enhancement for weapon possession . . . reflects the increased danger of violence when drug traffickers possess weapons.  The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  The Guideline then provides as an example of a "clearly improbable connection" a case of a defendant arrested with drugs who also had an unloaded hunting rifle in the closet. *Id.; see also United States v. Restrepo*, 884 F.2d 1294, 1296 (9th Cir. 1989) (holding that, "in applying § 2D1.1(b)(1), the court need not find a *connection* between the firearm and the offense.  If it finds that the defendant *possessed* the weapon during the commission of the offense, the enhancement is appropriate." (emphasis in original)).  Possession can be actual, or constructive. *See* Ninth Cir. Model Crim. Jury Instr. 3.15

Here, based on the number and type of firearms and ammunition that were in Defendant's home and carport (two of which were loaded) and the fact that the home and carport were where many of the drug deals took place, the government believes that this two-level enhancement applies.  As the PSR states, "there were several pole-mounted cameras that monitored the carport of Mr. Salazar's apartment complex where he conducted several drug deals."  PSR ¶ 3.  In addition, the PSR described how another individual who sold methamphetamine to a confidential information (CI) first went to defendant's home to obtain the methamphetamine, and then drove to meet the CI to conduct the sale. *Id.* ¶ 8.  The PSR further describes the search warrant executed at defendant's home on May 29, 2018, during which agents found:

> 2,752.425 grams of methamphetamine and 607 grams of heroin
> throughout Mr. Salazar's bedroom, carport and vehicle; . . . three firearms:

1

2

3

4

> one Beretta 9mm handgun bearing serial number A1110932 with a loaded magazine; a Marlin .22 caliber rifle with serial number V14018; and one Beretta 9mm handgun bearing serial number A032600Z; . . . [and] 11 handgun magazines; two boxes of .22 caliber ammunition; stream light light/laser; bag of .38 caliber ammunition; box of .38 caliber ammunition; black bin containing ammunition; black and silver case containing multiple rounds of ammunition.

5   PSR ¶¶ 16-17.  In addition, the PSR notes that "the Beretta 9mm handgun was located inside a backpack

6   in Mr. Salazar's bedroom."  *Id.* at ¶ 16.

7   　　　　　The Ninth Circuit consistently has upheld application of the two-level firearm enhancement in

8   facts similar to those here where the drug dealing conduct and drug seizures were in close proximity to

9   the seized firearms.  For example, in *Restrepo*, an informant purchased drugs from Restrepo at

10  Restrepo's home.  884 F.2d at 1295.  Law enforcement later searched Restrepo's home, finding

11  additional drugs and a loaded pistol hidden between the mattress and box spring of his bed.  *Id.*  On

12  appeal, Restrepo argued against the trial court's application of the two-level firearms enhancement, and

13  the Ninth Circuit upheld this enhancement, concluding that the trial court judge, "reasonably inferred

14  from the evidence that Restrepo possessed the weapon during the commission of the offense.  Several of

15  the offenses charged took place at his residence.  Agents found the [firearm] hidden between the

16  mattress and the box spring of his bed, in the same room as equipment used for drug distribution.  They

17  also found drugs in several places in his home."  *Id.*  The Ninth Circuit cited approvingly *United States

18  v. Gillock*, 886 F.2d 220, 222 (9th Cir. 1989), in which the Court upheld the firearm enhancement where

19  weapons were in a closet with five ounces of methamphetamine, money, and filter papers.  Similarly, in

20  *United States v. Boykin*, 785 F.3d 1352, 1364 (9th Cir. 2015), the Ninth Circuit found that the

21  government met its burden of proving constructive possession by a preponderance of the evidence

22  because agents recovered several firearms from a home where Boykin engaged in numerous drug

23  transactions.  *Id.*

24  　　　　　Here, given that Defendant was arrested with a significant quantity of methamphetamine and

25  heroin; agents found methamphetamine and heroin at his home (in his apartment and in his carport); and

26  agents found the firearms in his bedroom and carport, there is a basis to conclude that Defendant

27  possessed the firearms in connection with the offense, that he knew of their presence and had the ability

28  to control them, and it is not clearly improbable that they are unrelated to his drug trafficking.

## IV.    A 240-MONTH SENTENCE IS APPROPRIATE PURSUANT TO 18 U.S.C. § 3553(A)

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  As the Ninth Circuit has held, Courts should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines.  *Id.*  The Sentencing Guidelines are "the 'starting point and the initial benchmark,'" *United States v. Kimbrough*, 552 U.S. 85, 108 (2007) (quoting *United States v. Gall*, 552 U.S. 38, 49 (2007)), and are to be kept in mind "throughout the sentencing process."  *Gall*, 552 U.S. at 50, n. 6.  As noted by the Ninth Circuit, the Supreme Court has "clarified that we may attach a presumption of reasonableness to sentences falling within the Guidelines range."  *United States v. Saeturn*, 504 F.3d 1175, 1178 (9th Cir. 2007) (emphasis added).  After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991-93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for defendant, the Court should consider these factors, among others:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3)    the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4)    the need for the sentence imposed to protect the public from further crimes of the defendant;

(5)    the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

In analyzing the factors set forth above, the Government believes that a 240-month sentence is sufficient but not greater than necessary to achieve the goals of sentencing.

A.      **The Defendant Committed Repeatedly Committed Serious Offenses That Have Harmed Many in the District**

Defendant pled open, acknowledging his role in a conspiracy to distribute drugs and acknowledging his possession of controlled substances at the time of his arrests.  The particular drugs that Defendant dealt are addictive and lethal.

The quantity of drugs attributable to Defendant – 116,541.80 kilograms of drug equivalent – far exceeds the highest base offense level (38) available for this offense.  It is important for the Court to consider that the PSR calculation is based only on drugs actually seized or purchased from the Defendant during a narrow window of time.  It does not take into consideration all of the wiretap calls in which Defendant agreed to deal drugs, or the times when agents surveilled Defendant making apparent drug deals.  It does not take into consideration the drug dealing that Defendant engaged in before the time period of this conspiracy.  This quantity is frightening in the context of the health crisis facing this District.

Defendant is one of the people who has fueled the national opiate crisis and the local methamphetamine crisis.  On the west coast, and in the Bay Area, methamphetamine abuse is a significant problem.  On June 17, 2019, National Public Radio aired a piece entitled, "Meth in the Morning, Heroin at Night:  Inside the Seesaw Struggle of Dual Addiction.," *available at* https://www.npr.org/sections/health-shots/2019/06/17/730803759/meth-in-the-morning-heroin-at-night-inside-the-seesaw-struggle-of-dual-addiction.   The piece reports that, in San Francisco, "the number of heroin addicts reporting methamphetamine as a secondary substance problem has been rising.  In 2014, 14% of heroin users entering rehab in San Francisco said meth was also a problem. Three years later, 22% said meth was also a problem."  On May 1, 2019, National Public Radio aired a piece describing the significant health impact, and public risks, from methamphetamine use, including "methamphetamine-induced psychosis."  *See* "As Meth Use Surges, First Responders Struggle to Help Those in Crisis," *available at* https://www.npr.org/sections/health-shots/2019/05/01/716404677/as-meth-use-surges-first-responders-struggle-to-help-those-in-crisis.  The airing highlighted the challenges that emergency medical workers face in handling the uptick of methamphetamine addicts coming to area hospitals and the personal stories of those who struggle to overcome this addiction.  On February 8,

1   2019, the San Francisco Chronicle published an article entitled, "Meth deaths and ER visits climb

2   sharply in SF, as leaders look for solutions, written by Erin Allday. *See*

3   https://www.sfchronicle.com/health/article/Meth-deaths-and-ER-visits-climb-sharply-in-SF-as-

4   13599681.php.  The articles described how methamphetamine overdoses "doubled over the past decade"

5   and states that approximately "100 people died from methamphetamine overdoses in 2017, compared

6   with about 150 from all types of opioids[.]" *Id.*  "Long-term [methamphetamine] use can cause brain

7   damage.  People who overdose can become combative and unpredictable, and they may feel urges to

8   harm themselves or others.  Overdose deaths happen when methamphetamine causes sudden heart

9   failure or bleeding of the brain's main blood vessels." *Id.; see also* "Meth's Comeback:  A New Speed

10  Epidemic Takes Its Toll on San Francisco," *available at* https://www.kqed.org/news/11724407/meths-

11  comeback-a-new-speed-epidemic-takes-its-toll-on-san-francisco ("Since 2011, emergency room visits

12  related to meth have jumped 600 percent to 1,965 visits.  Admissions to the hospital are up 400 percent

13  to 193.  At Zuckerberg San Francisco General Hospital, of 7,000 annual psychiatric emergency visits, 47

14  percent are people who are not necessarily mentally ill — they're high on meth.").

15         While there are no identifiable victims of the Defendant's drug dealing, drug distribution leads to

16  drug abuse.  There are countless victims—not only addicts themselves, but their families and loved

17  ones—who suffer as a result.  The government does not expect that any victims will appear in Court for

18  sentencing, but the government urges the Court to consider these faceless many in evaluating the

19  appropriate sentence.

20         In evaluating the circumstances of the Defendant's arrest, they Court also should consider that

21  Defendant attempted to distribute a huge quantity of methamphetamine *after* his arrest in the instant

22  case.  Defendant was arrest in May 2018, released on bond, and then was arrested with another carload

23  of methamphetamine in October 2018. Defendant pled to the charged offense, admitting to this

24  additional conduct.  In considering the appropriate sentence, the Court should consider that, had the

25  government superseded the Indictment to extend the time period of the conspiracy to include October

26  2018, Defendant would have received a three-level Guidelines enhancement under U.S.S.G. § 3C1.3 for

27  an offense committed while Defendant was on pretrial release.  Had Defendant been charged separately

28  with his October 2018 conduct, he would face two separate charges, each of which would carry ten-year

1    mandatory minimum sentences.

2         Finally, in evaluating the nature and circumstances of the Defendant's offense:  the government

3    asks the Court to consider the presence of three firearms (two loaded), and all of the ammunition and

4    magazines found at Defendant's home.  As the application note to U.S.S.G. § 2D1.1(b)(1) states, a

5    Guidelines enhancement is appropriate because of the "increased danger of violence when drug

6    traffickers possess weapons."  Defendant possessed these firearms, and the drugs, in a home where his

7    children lived.  One was in a backpack in his bedroom, not hidden or locked away in a firearm safe.

8    These firearms were there to protect his significant drug stash, and they support a Guidelines sentence of

9    240 months in custody.

10        **B.    The History and Characteristics of Defendant Show that This was a Crime of
               Opportunity**

11

12        Many who come before the Court seem turn to drug trafficking out of some form of desperation.

13   It is inexcusable, but understandable in some way that such individuals see drug trafficking as the only

14   way to earn enough money to make ends meet.  Those Defendants prey off of customers in this District,

15   and they do so to support the ones that they love.  But that is not Jesus Salazar.  For him, this was a

16   crime of opportunity.  Defendant is a U.S. Citizen; he had a comfortable childhood; he has a loving

17   wife; he was able to obtain gainful employment.  While the government acknowledges that Defendant

18   states that his father was a drug trafficker in Mexico, Defendant moved to the United States.  He did not

19   have to reengage with drug trafficking ties once here.  That was his choice.  The Defendant states that he

20   also abused drugs, but this is no excuse for the level of trafficking in which Defendant engaged.

21   Personal use of cocaine and methamphetamine do not lead a person to have ties to drug dealers in

22   foreign countries who then transport those drugs into the United States and into this District.  Moreover,

23   Defendant made a calculated decision to continue to engage in drug dealing after his arrest and pretrial

24   release.  These factors support a Guidelines sentence of 240 months in custody.

25   //

26   //

27

28        **C.    A Significant Sentence Promotes Deterrence, Affords Just Punishment, and Gives
               the Public Relief from Defendant's Relentless Criminal Conduct.**

1    In the midst of a significant health crisis involving the very drugs that Defendant trafficked, the

2    Court stands in a position to be able to give people in this community relief from those who peddle

3    poison.  The people in this District deserve to have a significant source of drug supply shut off and

4    separated from the community for a long period of time.  A significant sentence also would deter others

5    who would engage in this form of conduct and who would try to do so while on pretrial release.  A

6    twenty-year sentence is significant, but it is what is appropriate given the seriousness of this offense.

7    **V.      CONCLUSION**

8    With full consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a), the

9    government respectfully requests that the Court impose a sentence of 240 months in prison and five

10   years of supervised release.

11   Dated:  September 19, 2019                    Respectfully submitted,

12                                                 DAVID L. ANDERSON
13                                                 United States Attorney

14   By:  _____/s/_____
15                                                 SHEILA A.G. ARMBRUST
                                                   Assistant United States Attorney